# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 12-CR-0136-CVE |
| JOHNNY LEE YOUNG, a/k/a "C-Nile", | ) |
| Defendant. | ) |

## OPINION AND ORDER

Defendant Johnny Lee Young is charged by indictment as a felon in possession of firearms and ammunition (count one), possession of cocaine base with intent to distribute (count two), and possession of firearms in furtherance of a drug trafficking crime (count three). Dkt. # 2. Defendant moved to suppress firearms, ammunition, cocaine, and any proof of residency found during a search of defendant's residence, as well as a statement made by defendant (Dkt. ## 18, 19), to which the government responded (Dkt. ## 41, 42). An evidentiary hearing on the motions was held on January 29, 2013.

At the evidentiary hearing, the parties stipulated that the motion to suppress evidence (Dkt. # 19) was based upon the legal sufficiency of the affidavits supporting the warrants and, therefore, there was no need for additional evidence on that motion. As to the motion to suppress statement (Dkt. # 18), a recording of a conversation between Officer Josh Dupler and defendant the evening

in question was received into evidence.[1] The parties stipulated that the government's statement of facts contained in its responses to the motions (Dkt. ## 18, 19) are what Officers Dupler and Wamsley would testify to if called.

On June 18, 2012, Tulsa Police Department (TPD) Officer Dupler applied for two warrants: one for defendant's residence, an apartment in the 7900 block of East 59th Street, Tulsa, Oklahoma, and a second for a 2009 black Kia sedan. Dkt. ## 41-1, 41-2. The affidavit in support of the search warrants recited that Officer Dupler had spoken with a reliable confidential informant (RCI) over the previous three years, regarding "the ongoing drug distribution of [defendant]." Id. at 2. Further, the affidavit stated that the RCI provided information regarding illegal drug sales to Officer Dupler since 2008 and that Officer Dupler had continued to verify the information provided by the RCI. Id. The RCI informed Officer Dupler that defendant "had been involved in the sale of cocaine for several years and is a member of the Hoover Crips Criminal Street Gang." Id. Officer Dupler also stated in the affidavit that defendant had prior arrests and a conviction for "dangerous drugs," and that he was a "certified" Hoover Crip gang member. Id. Officer Dupler recited that in 2008 Corporal Joel Ward and Officer Brian Booth received information that defendant was involved in the sale of controlled drugs in the area of East 61st Street and South Peoria Avenue, and, when defendant was later stopped, he had over $8,000 in his possession and was driving a 2006 Dodge "Pickup" that was registered to Debra Williams. Id. At that time, defendant claimed his sister,

---

[1] At the evidentiary hearing, the government offered, and the Court admitted as Government Exhibit 1, a CD that contained a recording of the conversation between Officer Dupler and defendant the evening of June 18, 2012, which was played in open court. The recitation of the facts herein includes direct quotes of both Officer Dupler and defendant based on the recording.

Debra Williams,[2] gave him the money to purchase a vehicle; however, when Officer Booth contacted Williams, Williams "gave a conflicting story." Id.

In the affidavit, Officer Dupler also stated he had information from two other confidential informants. The first informant (CI # 1) met with Officer Dupler in the month prior to the application for a search warrant, and CI # 1 informed Officer Dupler that "C-Nile," who he identified from a Tulsa Regional Automated Criminal Information System (TRACIS) photograph, was "involved in the trafficking of cocaine [and] . . . was a member of the Hoover Crips Criminal Street Gang." Id. Officer Dupler stated that CI # 1 had given information that Officer Dupler "verified to be reliable and has admitted to selling cocaine in the past for several years." Id. The second informant (CI # 2) met with Officer Dupler the two weeks prior to the application for the search warrant, and CI # 2 informed Officer Dupler that "C-Nile," who the informant also identified as defendant using a TRACIS photograph, "was a member of the Hoover Crips Criminal Street Gang [ ] and had been involved in sale of cocaine in the City of Tulsa for several years." Id. Officer Dupler recited that CI # 2 had provided information previously, which had been verified as reliable. Id.

The affidavit recited that, in the week prior to Officer Dupler's application for a search warrant, Officer Dupler again met with CI # 1, who informed Officer Dupler that defendant "was living at the 'Falls Apartments' located at 61st and Memorial Drive . . . and that he was driving a

---

[2] The affidavit recited that Debra Williams was also known as Debra Young, and officers "believed [defendant] and Williams were involved in the distribution of controlled dangerous substances and the money was the profit from their crimes." Dkt. # 41-1, at 2. Further, the affidavit also stated that the vehicle Officer Dupler received a search warrant to search was registered to a Deborah Williams, who Officer Dupler "believes . . . is Debra Young aka Williams (TPD # 198706), who is the sister of [defendant]." Id.

black Kia Sedan." Id. Officer Dupler stated, in the affidavit, that an employee of the apartment complex, after viewing a TRACIS photograph of defendant, identified defendant as a resident in the complex and that the employee informed him that defendant is in the complex "all the time." Id. Officer Dupler learned from the employee that defendant resided at 7946 East 59th Place, Apartment # 55-101, which was the residence identified by the search warrant. Id. Officer Dupler also saw a 2009 black Kia sedan, which had an Oklahoma license plate of 129-HMH and was registered to "Deborah Williams," parked in front of the apartment building that was identified by the employee. Id.

The affidavit further stated that, on June 18, 2012, Officer Dupler was conducting surveillance at 7946 East 59th Place, Apartment # 55-101, and he observed defendant "come down the stairs from the residence to be searched with a black backpack and enter the driver seat of the 2009 Black Kia Sedan (OK Tag # 129-HMH)." Id. Officer Dupler also noted that Officer Dave Wamsley, who was a "narcotics detector K-9 handler," was a handler for a detector dog named Buster. Id. Officer Wamsley had been a narcotics detector K-9 handler since October 2000, and he was responsible for the care, maintenance, training, and handling of Buster. Id. Both Officer Wamsley and Buster were "certified by the Council of Law Enforcement Education and Training [(CLEET)] as a narcotic detector K-9 team, and [held] license # K9-09-2162." Id. Further, Officer Wamsley "continues to work on a regular basis with his K-9, consistently and systematically verifying his K-9's abilities to detect controlled and dangerous drugs." Id. The affidavit recited that, on June 18, 2012, "Officer Wamsley walked his K-9 'BUSTER' along the apartment building containing the residence to be searched;" however, despite being "trained to alert to the odor of controlled substances," Buster did not alert at the door of defendant's apartment. Id. at 3.

4

Finally, the affidavit stated that, on June 18, 2012, Officer Dupler located the 2009 black Kia sedan in the parking lot near the Eton Square Cinema. Id. Officer Wamsley "walked his K-9 'BUSTER' along several vehicles in the parking lot[,] . . . [and] 'BUSTER' did alert to the odor of narcotics on the trunk of the 2009 Black Kia Sedan," which Officer Dupler identified as the same vehicle he saw defendant enter upon leaving the apartment. Id. Officer Dupler stated, in the affidavit, that "the residence to be searched is one of [the] locations where [defendant] currently conceals his illegally obtained monies and property as a result of his involvement in an unlawful drug distribution scheme." Id.

A state judge signed and issued both warrants, and the warrant for defendant's residence allowed officers to search for "**RECORDS AND FINANCIAL RECORDS IN PHYSICAL, DIGITAL, OR ELECTRONIC FORM, PROOF OF RESIDENCY, CELLULAR PHONES, KEYS, SAFES, SURVEILLANCE EQUIPMENT, FIREARMS**."[3] The search warrant for the black Kia sedan allowed officers to search for "**MONIES OR UNEXPLAINED WEALTH, RECORDS AND FINANCIAL RECORDS IN PHYSICAL, DIGITAL, OR ELECTRONIC FORM, PROOF OF RESIDENCY, CELLULAR PHONES, KEYS, SAFES, SURVEILLANCE EQUIPMENT, FIREARMS**." With the exception of the description of the place to be searched and the items sought, the affidavits in support two search warrants were identical. Dkt. ## 41-1, 41-2.

At approximately 5:15 p.m. on June 18, 2012, prior to the application for and issuance of the warrants, Officer Dupler drove by defendant's apartment and saw defendant walk down the stairs

---

[3] At the evidentiary hearing, the parties provided the search warrants for defendant's residence and automobile as Joint Exhibits A and B, which are attached to the minutes of the hearing. Dkt. # 44.

with a black backpack. Defendant looked around before entering the 2009 black Kia sedan, and defendant left the complex. The warrants were issued at 8:25 - 8:30 p.m. At approximately 9:45 p.m., TPD Special Investigations Division Narcotics Unit officers, including Officer Wamsley, assisted by Mingo Valley Division patrol officers, knocked on defendant's apartment door. After making two announcements and hearing no response, Officer Dupler used a key, which was provided by the apartment complex's management, to enter defendant's apartment. A fourteen year old black female, later identified as "RY," came toward the door, and she was thereafter removed from the apartment. When officers did not find anyone else in the apartment, they began their search and seized numerous items. Items seized from the kitchen included a black bag in the kitchen pantry containing one working digital scale and one clear "plastic baggy of tannish of [sic] rock-like substance, which field tested presumptive [sic] positive for cocaine;" one glass beaker and baking soda; one pot with white/tannish residue; seven Hydrocodone pills and 42 Soma pills, and pill packaging; and one vacuum sealer. Dkt. # 42, at 11. Officers also seized numerous items from the northwest bedroom, including two Cox bills addressed to defendant; one Smith & Wesson, Model SW40 VE, .40 caliber semi-automatic pistol, serial number DSE7113, which was loaded with 14 .40 caliber rounds of ammunition; one Norinco, Model DP, 7.62 caliber assault rifle, serial number 10001061, which was loaded with 10 rounds of 7.62 caliber ammunition; and photographs of defendant and family members. The TPD lab found that the amount of cocaine base found in defendant's apartment was 52.48 grams.

 Officer Wamsley thereafter proceeded to defendant's vehicle, which was parked at the ITT Technical Institute (ITT Tech) campus. TPD Officers Trace Zeller and Thomas Turner assisted Officer Wamsley and stopped defendant's vehicle when defendant left the parking lot at

approximately 10:14 p.m. When Officer Wamsley attempted to ask defendant questions regarding where defendant lived, defendant told Officer Wamsley that he could just talk to his attorney. Officer Wamsley told defendant that officers were waiting for an officer to arrive with the warrant to search defendant's vehicle, and defendant thereafter reinitiated conversation with Officer Wamsley. Defendant stated that Officer Wamsley could search the vehicle because there was nothing illegal inside the vehicle and it did not belong to defendant. When Officer Dupler arrived, Officer Dupler provided defendant with a copy of the search warrant for the vehicle, which he placed in defendant's shirt pocket.

At approximately 10:22 p.m., Officer Dupler began a conversation with defendant, while both were seated in the front seats of a car and defendant was restrained in handcuffs, pursuant to TPD policy. Officer Dupler told defendant that he had to read defendant his <u>Miranda</u> rights, and defendant stated that he knew his rights. Thereafter, Officer Dupler read defendant his <u>Miranda</u> rights from a card that Officer Dupler kept in his wallet, and Officer Dupler asked defendant whether he understood those rights, to which defendant responded, "yes, sir." Officer Dupler asked whether defendant wished to talk to him, and defendant confirmed that he would speak to Officer Dupler. Immediately after reading the <u>Miranda</u> warning, Officer Dupler asked defendant whether he had any questions for Officer Dupler before he began questioning defendant. Defendant asked Officer Dupler whether anyone else was going to get in trouble, including his daughter and anyone connected to the apartment, and Officer Dupler replied that they would not unless defendant wanted them to. Officer Dupler told defendant that officers had found a Cox bill addressed to him, a pistol, and a black bag in the closet of the apartment. Defendant seemed surprised that only his daughter was in the apartment at the time officers searched it, and he questioned Officer Dupler about whether

7

they planned to tow his car. Officer Dupler questioned defendant regarding the money found in the apartment, but defendant stated that he "couldn't even tell you" how much money was in the apartment. Defendant told Officer Dupler that he went to school, and, when Officer Dupler asked defendant how he made money, defendant stated he works on air conditioning and makes $50 "here and there."

Defendant thereafter denied living at 7946 East 59th Place, Apartment # 55-101. Officer Dupler again confronted defendant about the papers addressed to defendant, clothes, and pictures of defendant found in the apartment. Officer Dupler stated that he could not make any "threats or promises to you," but "maybe things don't go so bad, but if they do go really bad, it's gonna be really bad, you understand?" Defendant replied "yeah," and Officer Dupler asked defendant whether he was willing to accept responsibility. Officer Dupler told defendant that defendant was free to tell him "that's not my deal, and thanks but no thanks," and defendant responded that "we all gotta be accountable" and everything in the apartment was his. Defendant said "hopefully it don't go bad," but that he was trying to provide for his family while he attended school because he could not just attend school since he had four children he needed to provide for.[4]

Officers seized three items from the 2009 black Kia sedan: one Vista Shadow Mountain Apartments access card; one user manual for the same type of digital scales located with the

---

[4] In addition, the government proffered without objection that Officer Dupler's gun was either entirely not visible or barely visible, and Officer Dupler never pointed the gun at defendant. Further, Officer Dupler and defendant remained seated in the driver and passenger seats, and Officer Dupler was never any closer than that distance to defendant. Finally, the recording of the conversation between defendant and Officer Dupler ends with Officer Dupler allowing defendant to smoke a cigarette, and the entire recording is less than sixteen minutes long.

suspected crack cocaine; and one suspected house key on defendant's key ring, which was thereafter used by Officer Wamsley to unlock the door to defendant's apartment.

## I.

Defendant first argues that the firearms, ammunition, cocaine, and any proof of residency seized during the search of 7946 East 59th Place, Apartment # 55-101 should be suppressed because the search warrant lacked probable cause. Dkt. # 19, at 5-8. Further, defendant alleges that the good faith exception does not apply. Id. at 8-11. The government asserts that there was sufficient probable cause to issue the search warrant, and, even assuming that there was not, the good faith exception should apply, and the evidence should not be suppressed. Dkt. # 41, at 13-24.

Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 214 (1983). And, the inquiry is whether, under the totality of the circumstances, probable cause is established. Id. at 267. Further, an affidavit in support of a search warrant must contain facts sufficient to "lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998). Evidence provided by informants may provide probable cause if corroborated; however, the corroboration need not prove the information is correct regarding the criminal activity. Gates, 462 U.S. at 243-44. Instead, a police officer may verify the reliability of the informant through independent police work, and, even if all of the verified information is entirely innocent activity, it may still support probable cause that the suspect has contraband or evidence stored in a particular location. Id. at 243, n.13.

As to the requirement that the affidavit show a "nexus" between the place to be searched and the items sought, the affidavit must show a "nexus between . . . suspected criminal activity and the

place to be searched, and a court may not arrive at probable cause simply by piling hunch upon hunch." United States v. Roach, 582 F.3d 1192, 1200 (10th Cir. 2009) (quotation omitted). "Whether a sufficient nexus has been established between a defendant's suspected criminal activity and his residence [ ] necessarily depends upon the facts of each case." United States v. Biglow, 562 F.3d 1272, 1279 (10th Cir. 2009) (citation omitted). "Certain non-exhaustive factors relevant to [the] nexus analysis include (1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." Id. (citation omitted). "While the nexus requirement-like probable cause itself-is not reducible 'to a neat set of legal rules,' . . . our case law reveals that little 'additional evidence' is generally required to satisfy the Fourth Amendment's strictures." Id. (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003)). The Tenth Circuit has found that courts have "never required, for example, that hard evidence or 'personal knowledge of illegal activity' link a [d]efendant's suspected unlawful activity to his home." Id. (quoting United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,422.43) in U.S. Currency, 965 F.2d 868, 874 (10th Cir. 1992)) (citations omitted). "Instead, [the circuit court] [has] indicated that a sufficient nexus is established once 'an affidavit describes circumstances which would warrant a person of reasonable caution' in the belief that 'the articles sought' are at a particular place." Id. (quoting $149,422.43, 965 F.2d at 874) (citation omitted).

The Tenth Circuit has "long recognized that magistrate judges may 'rely on the opinion' of law enforcement officers 'as to where contraband' or other evidence 'may be kept.'" Id. (quoting United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997)). Therefore, in some cases, an affidavit containing an officer's statement that "certain evidence-in his or her professional

experience-is more likely to be found in a defendant's residence" has been sufficient to show a nexus; however, "an affiant officer need not draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist." Id. (citations omitted). Finally, evidence connecting the suspected criminal activity to the residence "may also take the form of inferences a magistrate judge reasonably draws from the Government's evidence." Id. (citations omitted). "In other words, magistrate judges may draw their own reasonable conclusions, based on the Government's affidavit and the 'practical considerations of everyday life,' as to the likelihood that certain evidence will be found at a particular place." Id. (citation omitted).

The affidavit supporting the search warrant for defendant's residence contained numerous facts sufficient to lead a reasonable person to believe defendant's residence would contain contraband, including that: the RCI, who had provided information that proved reliable over a period of years, identified defendant and provided information about defendant's ongoing drug enterprise; defendant was previously involved in a traffic stop where officers found $8,000 and, after which, officers learned that defendant's statement regarding who owned the vehicle was not truthful; CI # 1 identified defendant and stated that defendant trafficked cocaine in Tulsa, and, in the week prior to the execution of the search warrant, informed Officer Dupler of defendant's address as well as the vehicle he was driving; and CI # 2 identified defendant and stated that defendant sold cocaine in Tulsa. Dkt. # 41-1, at 2-3. Further, the affidavit also stated that Officer Dupler had confirmed defendant's previous conviction and arrests for "dangerous drugs," and that defendant was considered a "Career Criminal" in TRACIS. Id.

However, defendant argues that the only corroboration of the statements of RCI, CI # 1, and CI # 2 was Buster's "alert." And, defendant argues that Buster did not "alert" to the presence of

11

narcotics at the apartment door. Contrary to defendant's contention, the search warrant affidavit contains numerous assertions that corroborate the statements of RCI, CI # 1, and CI # 2. For example, officers found $8,000 in defendant's possession during a traffic stop, which officers believed was profit from defendant and Debra Williams' crimes. Dkt. # 41-1, at 2. Further, the statements of RCI, CI # 1, and CI # 2 are not uncorroborated because Officer Dupler states numerous times that each informant's information was verified, and found reliable, in the months and years preceding the issuance of the search warrant in this case. Finally, to the extent he could, Officer Dupler verified information he gained about defendant from the three informants. He verified the address of defendant, the car an informant stated that defendant would be driving, and defendant's history of arrests and a conviction involving drugs. "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." Gates, 462 U.S. at 243, n.13.

Therefore, a person of reasonable caution could conclude, given the statements of three informants, all of who had given information verified as reliable in the past, that defendant was involved in the sale of cocaine and that the articles sought in the search warrant for defendant's apartment would actually be present in defendant's apartment.

Finally, defendant argues that the "good faith exception," established in United States v. Leon, 468 U.S. 897 (1984), is inapplicable, and that the exclusionary rule is the appropriate remedy. Dkt. # 19, at 8. The government argues that, even assuming, arguendo, that the warrant did lack sufficient probable cause, the good faith exception should apply and the exclusionary rule should not. Dkt. # 41, at 18. Generally, there is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith." United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985);

12

United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009). "It is only when reliance [on the warrant] was wholly unwarranted that good faith is absent." Cardall, 773 F.2d at 1133. However, where an officer "knows or should have known that a search warrant was invalid," that officer "may not rely upon the good faith exception to immunize his subsequent seizure of evidence." Harrison, 566 F.3d at 1256 (citing Leon, 468 U.S. at 919). Because the purpose of excluding evidence is to "deter unlawful police conduct," evidence "should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Leon, 468 U.S. at 919 (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).

The Supreme Court has determined that there are situations where the good faith exception should not apply, including where: a magistrate judge was misled by the affiant and the affiant knew or should have known the information was false; "the issuing magistrate wholly abandoned his judicial role" so that "no reasonably well trained officer should rely on the warrant;" a "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" or a "warrant [was] so facially deficient . . . that the executing officers [could not] reasonably presume it to be valid." Leon, 468 U.S. at 923 (citations and quotations omitted). However, where an affidavit does not establish probable cause, suppression is not warranted if the officers relied in good faith on a duly authorized search warrant, subject to the exceptions outlined above. United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2011).

Officer Dupler, as the affiant, cannot be said to have had knowledge that the search violated the Fourth Amendment. Instead, Officer Dupler stated that three separate informants, who had previously proven reliable, informed him that defendant was involved in drug trafficking, that

13

defendant had previous arrests and a conviction involving drugs, and that he confirmed information given by one informant that defendant lived at a certain address and drove a black Kia sedan. Once the magistrate determined there was probable cause to search defendant's residence from the information Officer Dupler provided, officers were entitled to rely on that determination. The motion to suppress evidence (Dkt. # 19) is denied.

**II.**

Second, defendant argues that his statement should be suppressed for several reasons. Defendant argues, first, that his statement should be suppressed as the fruit of the allegedly illegal search of his residence. Dkt. # 19, at 1. Defendant also argues that, because defendant asserted his right to counsel during a custodial interrogation and the government cannot prove any waiver of his rights, any statement was obtained in violation of defendant's Fifth Amendment rights. Dkt. # 18. Finally, defendant argues that any waiver was not voluntary. Id. The government argues that the questioning was not a custodial interrogation, that defendant's supposed invocation of his right to counsel was not unequivocal such that officers were required to cease questioning him, and that defendant reinitiated the conversation and, therefore, cannot claim that officers ignored his request for counsel. Dkt. # 42, at 6-7.

First, because the search warrant for defendant's residence was supported by probable cause, defendant's statement cannot be the fruit of an illegal search and, therefore, defendant's argument that his statement should be excluded on that ground must fail.

A defendant's statement is generally inadmissible if law enforcement officers elicited the statement during a custodial interrogation without first giving the prescribed warnings and obtaining a waiver of defendant's rights. Miranda v. Arizona, 384 U.S. 436, 444 (1966). A person is in

14

custody if the person is "deprived of his freedom by the authorities in any significant way." Id. at 478. In assessing whether a person was "in custody," the only relevant question "is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 422 (1984). But, even when a person is in custody, the person must still be subject to "interrogation" before Miranda protections apply. "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. Therefore, questions about a person's name and address are generally not subject to Miranda protections. United States v. Lara-Garcia, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007); United States v. McCurdy, 40 F.3d 1111, 1115 (10th Cir. 1994) ("'[d]isclosure of name and address is essentially a neutral act,' and 'it would be the 'extravagant' extension of the privilege . . . to hold that it is testimonial in the Fifth Amendment sense.'" (quoting California v. Byers, 402 U.S. 424, 431-32 (1971) (alterations in McCurdy))).

Defendant was detained until Officer Dupler could arrive with the search warrant for defendant's vehicle. Further, defendant was placed in handcuffs. Therefore, defendant was in custody, and Miranda warnings were necessary prior to any interrogation. However, the initial questions regarding his residence, asked by Officer Wamsley prior to Officer Dupler reading defendant his Miranda warnings, were akin to questions "normally attendant to arrest and custody," and were not "reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301. Thus,

the questions regarding defendant's residence were not "interrogation," and defendant's statement should not be suppressed on that ground.

However, defendant also argues that his statement that officers could talk to his lawyer was an invocation of his right to counsel. "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Davis v. United States, 512 U.S. 452, 458 (1994) (citations omitted). Whether a person has invoked their right to counsel is an objective inquiry. Id. at 459. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. at 459 (citing McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers are not required to cease questioning the suspect. Id. Thus, invocation of the right to counsel must be unambiguous. Id.

Here, when asked basic questions about where he lived, defendant, apparently flippantly, told officers that they could just talk to his attorney.[5] Such a remark is not the unambiguous or unequivocal request envisioned by the Supreme Court in Davis. Instead, the Supreme Court found that officers need not cease questioning if defendant might be invoking his right but, instead, only if defendant has certainly asserted his right to counsel. From an objective viewpoint, the Court finds

---

5   The parties stipulated that there was no recording of the conversation between defendant and Officer Wamsley wherein defendant made this statement; however, there was no factual dispute regarding the content of the conversation between defendant and Officer Wamsley.

that defendant's remark did not unequivocally assert his right to counsel, and, therefore, officers were free to continue questioning defendant.

After Officer Wamsley asked questions about defendant's residence, and defendant stated that he could just talk to defendant's attorney, defendant thereafter reinitiated conversation and told officers that they could search the vehicle. However, prior to any further questioning by officers or statement by defendant, Officer Dupler read defendant his Miranda rights; therefore, defendant's remaining argument that his statement should be suppressed flow from his conversation with Officer Dupler after Officer Dupler read the Miranda warning.[6] Thus, defendant argues that, despite the warnings, his waiver and subsequent confession were not voluntary.

Specifically, defendant asserts that Officer Dupler's remarks about things going "bad" or other people being in trouble rendered any waiver or confession involuntary. "A waiver of Miranda rights must be made voluntarily, knowingly, and intelligently." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010) (citation omitted). The Tenth Circuit has found that the "inquiry into a waiver's validity has two dimensions." Id.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

---

[6] The Court notes that, despite the fact that defendant reinitiated the conversation by stating that the officers could search his car, because defendant was in custody and thereafter subject to interrogation by Officer Dupler, Miranda warnings were necessary before the interrogation; thus, reinitiation of the conversation alone is not enough to warrant denying defendant's motion to suppress statement.

17

Id. (quoting Smith v. Mullin, 379 F.3d 919, 932 (10th Cir. 2004)). In determining whether a defendant voluntarily waived his rights, a court should "consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." Id. (citation omitted). And, "[t]he same factors are assessed in determining whether a confession was voluntarily given." Id. As to coercive police activity that might render a confession involuntary, "the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'" Id. (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)).

First, defendant was advised of his Miranda rights, and he was therefore fully aware of the nature of the right that he was waiving. In fact, defendant attempted to stop Officer Dupler from reading the Miranda warnings because, he stated, he already knew his rights. Further, Officer Dupler confirmed, after having read the Miranda warnings, that defendant both understood those rights and that defendant was willing to speak with Officer Dupler.

Second, Officer Dupler's remarks certainly do not rise to the level of threatening to use physical force and, further, defendant had not been detained an extremely long of time nor was the nature of the detention one that would otherwise lead one to presume that defendant's waiver or subsequent confession were involuntary. Instead, defendant was able to answer all questions clearly, and he was obviously aware of the circumstances surrounding Officer Dupler's questions. Defendant laughed and was congenial during his conversation with Officer Dupler, and he felt free to bargain with officers regarding whether officers planned to tow his car. Further, defendant stated that he knew his rights, and he agreed to speak to Officer Dupler as soon as Officer Dupler completed a reading of the Miranda rights. Finally, defendant was seated in the front seat of a car

and, although he was restrained, the conversation lasted less than sixteen minutes. A remark that "things" might go "bad" or that other people would not be in trouble unless defendant wanted them to be, are not statements such that defendant's "will was overborne by the circumstances." Id. Therefore, the motion to suppress statement (Dkt. # 18) is denied.

**IT IS THEREFORE ORDERED** that defendant's motions to suppress (Dkt. ## 18, 19) are **denied.**

**DATED** this 29th day of January, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE